# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-18-00546-CR

---

**Andrew Lenard Hardesty, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE 264TH DISTRICT COURT OF BELL COUNTY
NO. 75106, THE HONORABLE JOHN GAUNTT, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Andrew Lenard Hardesty of the offense of capital murder. *See* Tex. Penal Code § 19.03(a)(3). The district court rendered judgment on the verdict and sentenced Hardesty to life imprisonment without parole, as required by law. *See id*. § 12.31(a)(2). In two issues on appeal, Hardesty asserts that the district court erred in failing to include a "jailhouse informant" instruction in the jury charge and abused its discretion in admitting hearsay. We will affirm the district court's judgment.

## BACKGROUND

The jury heard evidence that on the morning of October 20, 2014, Hardesty shot Christine Watkins, an African-American woman, twelve times outside her home in Killeen as she was approaching her car to go to work. Christine's husband, Kenneth, who was also outside

at the time of the shooting, testified that as he was walking toward his truck, he heard Christine say, "Oh no," followed by multiple gun shots.[1] Kenneth, afraid that the shooter was going to come for him next, jumped into his truck and drove down the street to his son's house to get help. Kenneth testified that he was not able to identify the person who shot Christine, but he thought he saw a white or Hispanic male, wearing black or dark gray clothing and either a ski mask or stocking cap over his face.

The shooting was recorded by a security camera placed above the Watkins' front door, and a copy of the recording was admitted into evidence and played for the jury. In the recording, Kenneth can be seen leaving the house, followed shortly thereafter by Christine. As Christine is approaching her car, a man wearing black pants and what appears to be a gray hoodie can be seen running toward her, firing a gun. Christine retreats and falls to the ground, while the man continues shooting her at close range.

William Camacho lived next door to the Watkins. Camacho testified that on the morning of October 14, 2014, six days before the shooting, he went outside his house and saw a man, dressed in a black hoodie and black pants, "coming out of [a] bush" and walking toward him. The man told Camacho, "Good morning," and Camacho did the same. Camacho estimated that the person was "no more than seven feet" away from him at the time of the encounter. Camacho did not see the man again. The following night, Camacho heard a noise outside his house and learned the next morning that someone had set fire to the Watkins' curtains. Several months later, the police showed Camacho a photo lineup and Camacho identified Hardesty as the man he had seen outside his house. Camacho also identified Hardesty during trial.

---

[1] Because Christine and Kenneth share the same surname, we will refer to them using their first names.

The lead investigator in the case was Detective Terry Kaiser of the Killeen Police Department. During the investigation, Detective Kaiser learned that there had been a lawsuit between the Watkins and one of their neighbors across the street, Jo Ann Wilbert, and that Wilbert had lost the lawsuit. Kaiser testified that he had interviewed Wilbert several hours after the shooting and that, following the interview, Wilbert "packed up and moved to Florida."

Kenneth testified that Wilbert had been "constantly harassing" him and his wife prior to the shooting. Kenneth explained that he and his wife owned rental homes on their street, and they rented one of their homes to a Hispanic couple. This angered Wilbert, who "didn't like Hispanics." In an apparent act of retaliation for the rental decision, Wilbert took down a fence that separated her property from one of the properties owned by the Watkins and demanded that the Watkins "pay half to put the fence back up." Kenneth refused to do so, which led to Wilbert's lawsuit. After Wilbert lost the suit, she began filing complaints with the City of Killeen asserting that the Watkins were violating city code provisions. The complaints were found to be without merit. Wilbert would also flash her outside lights on and off at night to harass the Watkins.

Detective Kaiser testified that Wilbert was the "primary suspect" in the murder. Kaiser's investigation of Wilbert led him to other individuals, including Jack Dutton, who acted as a "bodyguard" for Wilbert,[2] and John Horn, Wilbert's former friend, both of whom had knowledge of Wilbert's history with the Watkins. Kaiser also interviewed individuals who were associated with Hardesty, including Greg Pickens, Julia Driskell, and Jermie Romel, each of whom testified at trial.

---

[2] The record is unclear as to how Dutton acted as a "bodyguard" for Wilbert, although Kaiser testified that Dutton drove Wilbert to Florida and "was watching her house for some time."

Greg Pickens, who had been friends with Hardesty at the time of the murder, testified that Hardesty had borrowed money from him in December 2014. As collateral, Hardesty gave Pickens a black, semi-automatic handgun that "seemed like it was brand new." When Pickens asked Hardesty why he had not simply sold the gun for money at a pawn shop, Hardesty told him that he "didn't want to put the gun in the system." Based on ballistics testing performed on shell casings, projectiles, and bullet fragments recovered from the crime scene, the police determined that this was the same firearm that had been used in the shooting. The gun was admitted into evidence as State's Exhibit 43. Detective Kaiser learned that on October 8, 2014, Wilbert had purchased a .40 caliber Sig Sauer semi-automatic handgun, along with a box of .40 caliber ammunition, from a pawn shop in Killeen. Kaiser testified that this was the same gun that had been marked as State's Exhibit 43. Kaiser also testified that the gun had never been reported as stolen.

Julia Driskell, Hardesty's ex-girlfriend, testified that she and Hardesty knew Jack Dutton, Wilbert's "bodyguard." Driskell testified that in 2014, Hardesty began meeting with Wilbert. Hardesty told Driskell that he had been doing various "jobs" for Wilbert, that Wilbert had bought Hardesty a gun and hired him to kill a woman, and that Wilbert owed Hardesty money for the job. Driskell also testified that Hardesty told her that he had shot the woman and that after the shooting, he gave the gun to Pickens. Hardesty also told Driskell that on an earlier occasion, he had started a fire in the woman's house.

Jermie Romel, an Army veteran who was acquainted with Hardesty through Jack Dutton, a mutual friend, testified that Hardesty claimed that he had served as a sniper in the military. During one of their conversations, Hardesty told Romel that he had been hired by

Dutton for a "job" that involved "a lady that lived somewhere in Killeen that someone wanted removed or wanted to get them out of the area or something like that." Romel elaborated:

> He had said . . . the job was . . . getting some lady to move out of the area. You know, he tried to get this lady to move. After a few days and not being able to get her to move, he actually said he dressed up in a suit and depicted himself as the devil and walked up the driveway and exchanged fire between her and her husband, some lady and her husband. And supposedly the lady got shot.

When asked to describe what he meant when he said that Hardesty had depicted himself as "the devil," Romel testified, "Blacked out with a mask on." Romel further testified that Hardesty told him that he had been paid $20,000 for the job by a woman and that this woman "never really paid him" but instead "took off for Florida."

Russell Parrish, an inmate in the Bell County Jail, shared a jail cell with Hardesty. Parrish testified that Hardesty told him that he had killed a woman by hiding out as a "sniper" in her yard and that he "shot her without her husband even being able to see him." Hardesty also told Parrish that he had earlier set fire to the woman's house.

The jury found Hardesty guilty of capital murder. This appeal followed.

**ANALYSIS**

**Charge error**

In his first issue, Hardesty asserts that two of the State's witnesses, Russell Parrish and Jermie Romel, were "jailhouse informants" and that the district court erred in failing to include in the jury charge a jailhouse-informant instruction relating to their testimony. A jailhouse-informant instruction, when applicable, should track the language of article 38.075 of the Code of Criminal Procedure, which includes the following:

5

(a)    A defendant may not be convicted of an offense on the testimony of a person to whom the defendant made a statement against the defendant's interest during a time when the person was imprisoned or confined in the same correctional facility as the defendant unless the testimony is corroborated by other evidence tending to connect the defendant with the offense committed.

(b)    Corroboration is not sufficient for the purposes of this article if the corroboration only shows that the offense was committed.

Tex. Code Crim. Proc. art. 38.075.

As an initial matter, we disagree with Hardesty's contention that Romel was a "jailhouse informant" as that term is defined in Article 38.075. Romel testified that he was incarcerated in the Bell County Jail on drug possession charges from January 2018 through May 31, 2018. The statements that Hardesty made to Romel were made prior to Hardesty's arrest in 2015, at a time when neither Romel nor Hardesty were in jail. Thus, those statements were not made "during a time when [Romel] was imprisoned or confined in the same correctional facility as the defendant," and Article 38.075 does not apply to Romel's testimony.

On the other hand, Parrish, who shared a jail cell with Hardesty at the time of their conversation, qualifies as a "jailhouse informant." Accordingly, the State concedes that the district court erred in failing to provide a jailhouse-informant instruction relating to Parrish's testimony.

When there is jury-charge error, we apply the familiar *Almanza* framework for assessing harm. *See Almanza v. State*, 686 S.W.2d 157, 171-72 (Tex. Crim. App. 1985) (op. on reh'g). "Under *Almanza*, the degree of harm required for reversal depends on whether the error was preserved in the trial court." *Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015) (citing *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005); *Almanza*, 686 S.W.2d

6

at 171). Here, Hardesty did not object to the charge at trial. Thus, "reversal is required only if the error was fundamental in the sense that it was so egregious and created such harm that the defendant was deprived of a fair and impartial trial." *Id*. "Charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Id*. "Egregious harm is a 'high and difficult standard' to meet, and such a determination must be 'borne out by the trial record.'" *Id*. (quoting *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013)).

Jailhouse-informant testimony under Article 38.075 is treated similarly to accomplice-witness testimony under Article 38.14. *See* Tex. Code Crim. Proc. art. 38.14 ("A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense."); *Phillips v. State*, 463 S.W.3d 59, 67 (Tex. Crim. App. 2015) ("Just as Article 38.14 was enacted to address how to handle accomplice-witness testimony, Article 38.075 was enacted to similarly address the unreliability of jailhouse-witness testimony."); *see also Brooks v. State*, 357 S.W.3d 777, 781–82 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd). Therefore, under an egregious-harm analysis, the omission of a jailhouse-informant instruction is "generally harmless" unless the corroborating evidence is "'so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive.'" *Herron v. State*, 86 S.W.3d 621, 632 (Tex. Crim. App. 2002) (quoting *Saunders v. State*, 817 S.W.2d 688, 692 (Tex. Crim. App. 1991)); *see Brooks*, 357 S.W.3d at 782.

In this case, the evidence that "tended to connect" Hardesty to the offense, apart from Parrish's testimony, was strong. This evidence included: (1) Hardesty's statements to Julia

Driskell that Wilbert had hired him to kill a woman, that Wilbert had bought a gun for him to use, that he had shot the woman, and that after shooting her, he gave the gun to their friend, Greg Pickens; (2) ballistics evidence establishing that the gun found in the possession of Greg Pickens was the same gun that was used in the shooting; (3) Detective Kaiser's testimony that the gun Wilbert had purchased in October 2014 was the same gun that was found in the possession of Pickens; (4) the testimony of the Watkins' next-door neighbor, William Camacho, that he had seen a man dressed in dark clothing outside his house several days before the murder and identified this man, both in a photo lineup and at trial, as Hardesty; (5) Hardesty's statements to Romel that he had been hired to "get[] some lady to move out of the area," that when his efforts failed, he went to her house dressed in black and shot her, and that the woman who had agreed to pay him for the job "never really paid him" but instead "took off for Florida"; and (6) Driskell's testimony that Hardesty knew Jack Dutton, Wilbert's bodyguard, and that she had seen Wilbert and Hardesty together. We cannot say that this evidence is "so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive." *See State v. Ambrose*, 487 S.W.3d 587, 598–99 (Tex. Crim. App. 2016); *Casanova v. State*, 383 S.W.3d 530, 539–40 (Tex. Crim. App. 2012); *Herron*, 86 S.W.3d at 633–34; *Brooks*, 357 S.W.3d at 782–84. We also observe that the State mentioned the jailhouse-informant testimony on only one occasion during its closing argument and instead emphasized the other evidence in the case, summarized above. On this record, we cannot conclude that Hardesty was "egregiously harmed" by the omission of the jailhouse-informant instruction in the jury charge.

We overrule Hardesty's first issue.

8

**Hearsay**

In his second issue, Hardesty asserts that the district court abused its discretion in admitting hearsay statements made by Wilbert, which came in through the testimony of two witnesses. The first witness was Kenneth, who testified as follows:

Q. And did you, at some point, have a disagreement with Jo Ann Wilbert over one of your rent houses?

A. Yes, I did.

Q. And tell us what happened with that.

A. I had a—I owned a rent house down at 1310 Pine that I rented to a Hispanic couple. And she seemed like she didn't like Hispanics.

Q. Did she say that that was a problem? I'm talking about Jo Ann.

A. Yes.

Q. And did your relationship go south from that point on?

A. Yes, it did. She told us—

[Defense counsel]: Hearsay, Your Honor. Objection.

[Statement]: Judge, it's the statement of a co-conspirator.

[The court]: It's admissible.

Q. What did she say?

9

A.        She told us if we rented that house to the Hispanic couple, that we would regret it for the rest of our life.

The second witness was Wilbert's former friend, John Horn, who testified as follows:

Q.        Did something cause your relationship with Ms. Wilbert to sort of start coming apart?

A.        Yes.

Q.        Did she ever talk to you about one of her neighbors?

A.        Yes.

Q.        What did she tell you about that?

[Defense counsel]:    Objection; hearsay, Your Honor.

[The court]:    Sustained.

[The State]:    Your Honor, part of this goes to the relationship we're talking about. We've already put in evidence that Jo Ann Wilbert is the intellectual author of this solicitation of capital murder. If someone else was asked to do something beforehand like that, that's relevant to the solicitation.

[The court]:    It's a statement by a co-conspirator. I'll allow it.

[The State]:    Thank you.

Q.        Tell us about that, sir.

A.        She had a real hate for Mrs. Christine Watkins, the neighbor. And that progressed. I mean, I thought, you know, it was just someone angry. It was over a boundary

10

dispute that she had with the neighbor because she had also owned the house next to Mrs. Wilbert.

Q.    Did she ask you to assist her in any way to do anything to Christine Watkins?

A.    Yes, she did. . . .  [S]he wanted me to come into this courtroom and testify that I saw [her neighbor] trespassing. I didn't do it.  And that's when everything went really bad because I told her, look, I'm not going to come into court and lie about it.

Q.    Besides asking you to commit perjury in court, did she ask you to do anything else to cause harm to Christine Watkins?

A.    She asked me on several different times if I knew someone in the KKK that wouldn't mind getting rid of a ni**er.

Hardesty argues that Wilbert's statements to both Kenneth and Horn were inadmissible hearsay.  *See* Tex. R. Evid. 801(d) (defining hearsay as out-of-court statement offered in evidence to prove truth of matter asserted), 802 (providing that hearsay is generally inadmissible unless exception applies).  The State argues in response that the statements were admissible under the co-conspirator exception to the hearsay rule, which provides that a statement is not hearsay if it is offered against an opposing party and "was made by the party's co-conspirator during and in furtherance of the conspiracy."  Tex. R. Evid. 801(e)(2)(E). Hardesty contends that the co-conspirator exception does not apply here, because Wilbert's statements were made neither "during" nor "in furtherance of" any conspiracy.  *See Byrd v. State*, 187 S.W.3d 436, 440–44 (Tex. Crim. App. 2005); *Meador v. State*, 812 S.W.2d 330, 333–34 (Tex. Crim. App. 1991); *see also* Tex. Penal Code § 15.02(a) ("A person commits criminal

conspiracy if, with intent that a felony be committed, he agrees with one or more persons that they or one or more of them engage in conduct that would constitute the offense; and he or one or more of them performs an overt act in pursuance of the agreement.").

We agree with Hardesty that Wilbert's statements to Kenneth and Horn did not fall under the co-conspirator exception to the hearsay rule. For that exception to apply, a conspiracy must have existed at the time the statements were made. *See Deeb v. State*, 815 S.W.2d 692, 697 (Tex. Crim. App. 1991); *Williams v. State*, 790 S.W.2d 643, 644 (Tex. Crim. App. 1990). A conspiracy exists if, with intent that a felony be committed, a person agrees with another that they, or one of them, engage in conduct constituting an offense, and one of them performs an overt act in pursuance of the agreement. *See* Tex. Penal Code § 15.02(a). There is no evidence in the record indicating that at the time Wilbert made her statements to Kenneth and Horn, any person had agreed with Wilbert to murder Christine. Thus, Wilbert's statements were not made "during" a conspiracy, nor were they made "in furtherance of" a conspiracy. Accordingly, the statements were inadmissible under the co-conspirator exception to the hearsay rule, and the State never urged an alternative basis for their admission. *See Byrd*, 187 S.W.3d at 443–44 (explaining that co-conspirator exception to hearsay rule is "very narrow").

However, we cannot conclude on this record that Hardesty was harmed by the admission of the statements. "The erroneous admission of evidence is non-constitutional error." *Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018) (citing *Taylor v. State*, 268 S.W.3d 571, 592 (Tex. Crim. App. 2008)). "Non-constitutional errors are harmful, and thus require reversal, only if they affect Appellant's substantial rights." *Id*. (citing Tex. R. App. P. 44.2(b)). The Court of Criminal Appeals has construed this to mean that "an error is reversible

only when it has a substantial and injurious effect or influence in determining the jury's verdict." *Id.* (citing *Taylor*, 268 S.W.3d at 592). "If we have a fair assurance from an examination of the record as a whole that the error did not influence the jury, or had but a slight effect, we will not overturn the conviction." *Id.*

When assessing the harm from improperly admitted hearsay, it is well established that "[i]f the fact to which the hearsay relates is sufficiently proved by other competent and unobjected to evidence . . . the admission of the hearsay is properly deemed harmless." *Anderson v. State*, 717 S.W.2d 622, 627 (Tex. Crim. App. 1986); *see Marshall v. State*, 210 S.W.3d 618, 630–31 (Tex. Crim. App. 2006); *Brooks v. State*, 990 S.W.2d 278, 287 (Tex. Crim. App. 1999); *Burks v. State*, 876 S.W.2d 877, 898 (Tex. Crim. App. 1994); *Temple v. State*, 342 S.W.3d 572, 600–01 (Tex. App.—Houston [14th Dist.] 2010), *aff'd*, 390 S.W.3d 341 (Tex. Crim. App. 2013); *Matz v. State*, 21 S.W.3d 911, 912–13 (Tex. App.—Fort Worth 2000, pet. ref'd); *see also Thorpe v. State*, No. 03-18-00070-CR, 2019 Tex. App. LEXIS 4292, at *8–9 (Tex. App.—Austin May 24, 2019, no pet. h.) (mem. op., not designated for publication).

In this case, the hearsay statements relate to Wilbert's hostility toward the Watkins. Hardesty asserts that he was harmed by this evidence because it established the element of "remuneration," i.e., that Wilbert paid him to kill Christine. In this case, evidence of remuneration was essential to elevate the offense of murder to capital murder. *See* Tex. Penal Code § 19.03(a)(3) (providing that person commits offense of capital murder if "the person commits the murder for remuneration or the promise of remuneration").

However, there was other evidence presented at trial of Wilbert's hostility toward the Watkins that was admitted without objection. For example, when Kenneth was asked if Wilbert had told him that renting a house to a Hispanic couple would be "a problem," Kenneth

13

testified without objection, "Yes." Kenneth also testified without objection that after they had rented to a Hispanic couple, Wilbert was "constantly harassing" them, had filed a lawsuit against them, and, when that failed, had reported them to the City for code violations that were found to be without merit.

Regarding Horn's testimony, Horn testified without objection that Wilbert had asked him if he "knew someone in the KKK that wouldn't mind getting rid of a ni**er."[3] Similarly, a letter that Wilbert had written to Horn, referring to the lawsuit that Wilbert had filed against the Watkins, was admitted without objection. In the letter, Wilbert told Horn that he needed to testify against the Watkins and referred to either Christine or Kenneth using a racial slur:

John

I know you don't want to testify in court but I paid you good money, I treated you good and you are going to keep up your end of the bargain. You need to testify against the ni**er or I will subpoena you as a witness. If you fail to show up for court—it is a felony.

You owe me big time.

This evidence establishes Wilbert's hostility toward the Watkins and tends to show that she was willing to pay others "good money" to harm them.

---

[3] Although Hardesty objected when the State first asked Horn to describe what Wilbert had told him regarding the Watkins, he failed to obtain a running objection to that line of questioning. *See Valle v. State*, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003) (explaining that defendant "must object each time the inadmissible evidence is offered or obtain a running objection"). Thus, when the State asked Horn additional questions relating to Wilbert's statements, they were admitted without objection.

Additionally, there was evidence in the record other than Wilbert's statements to Kenneth and Horn tending to show that Hardesty had killed Christine for remuneration, specifically the statements that Hardesty had made to Julia Driskell and Jermie Romel. In those statements, Hardesty admitted that Wilbert had hired him to kill a woman, that he had done so, and that Wilbert had failed to pay him for the murder. In light of this and other evidence, we cannot conclude that Wilbert's statements had "a substantial and injurious effect or influence in determining the jury's verdict." Thus, their admission was harmless. *See Anderson*, 717 S.W.2d at 627 (concluding that any error in admission of hearsay was harmless when other evidence establishing motive to commit murder was admitted without objection).

We overrule Hardesty's second issue.

### CONCLUSION

We affirm the district court's judgment of conviction.

_____

Gisela D. Triana, Justice

Before Chief Justice Rose, Justices Triana and Kelly

Affirmed

Filed:   August 29, 2019

Do Not Publish

15